**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| STEVE MICHAEL COX,        )<br>                                              )<br>           Plaintiff,             )<br>                                              )<br>     v.                                    )<br>                                              )<br>GLEN WHORTON, *et al.,*  )<br>                                              )<br>           Defendants.         )<br>_____) | 3:08-cv-00110-RCJ-VPC<br><br>**REPORT AND RECOMMENDATION**<br>**OF U.S. MAGISTRATE JUDGE**<br><br>February 14, 2011 |

This Report and Recommendation is made to the Honorable Robert C. Jones, United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and LR IB 1-4. Before the court is defendants' motion for summary judgment (#102).[1] Plaintiff opposed (#113) and defendants replied (#115). The court has thoroughly reviewed the record and recommends that defendants' motion for summary judgment (#102) be granted.

### I. HISTORY & PROCEDURAL BACKGROUND

Plaintiff Steve Michael Cox ("plaintiff"), a *pro se* inmate, is currently incarcerated at Ely State Prison ("ESP") in the custody of the Nevada Department of Corrections ("NDOC") (#1-6, p. 2). Plaintiff brings his first amended complaint pursuant to 42 U.S.C. § 1983, alleging that prison officials deprived him of his property, retaliated against him, and were deliberately indifferent to his medical needs in violation of the First, Eighth, and Fourteenth Amendments. *Id.* Plaintiff named as defendants E.K. McDaniel, ESP Warden; Adam Endel, ESP Associate Warden of Programs; R. Chambliss, ESP caseworker; Dr. Bishop, ESP physician; Theodore D'Amico, NDOC Medical Director; Boja Lemich, ESP nurse; Sergeant Prince, ESP correctional officer; C. Tripp, ESP caseworker; Lieutenant Messick, ESP correctional officer; R. Williams; S. Smith, ESP nurse; and Ross Miller; Nevada Secretary of State. *Id.* Plaintiff's remaining claims, after screening (#10) and the court's ruling (#36) on defendants' prior motion to dismiss (#11), include the following: (1)

---

[1]     Refers to the court's docket numbers.

1  count one due process and retaliation against defendant Chambliss in connection with confiscation
2  of plaintiff's mattress and charges for replacement of the mattress; (2) count two due process and
3  retaliation against defendant Messick related to confiscation of two law books during a cell search;
4  (3) count seven deliberate indifference and retaliation against defendant Bishop in connection with
5  termination of plaintiff's Elavil prescription; and (4) count eight deliberate indifference and
6  retaliation against defendant Lemich in connection with plaintiff's scheduled July 26, 2006 medical
7  visit (#25, p. 14; #36). Remaining defendants include Chambliss, Bishop, Lemich, and Messick.
8  *Id.* The specific factual details for each claim appear below.

### A.   Count One

In count one of plaintiff's amended complaint he claims that he was improperly charged restitution for a dilapidated mattress, which he stitched together with pen cartridges (#1-6, p. 8-9). Plaintiff believes that he should have been charged the depreciated replacement value of the mattress, rather than the full replacement value of fifty dollars. *Id.* at 9. Plaintiff states that he has a liberty interest in his inmate account and that this interest prevents defendants from "unlawfully, illegally" overcharging him. *Id.* In his opposition to defendants' motion, plaintiff cites to the "yearly pattern/chronology of false/dubious, etc. 'notice of charges (N.O.C.),' convictions, and sanctions/solitary confinement imposed against plaintiff" (#112, p. 6, 54-56; #102-4, p. 2-6). Plaintiff believes these "yearly, escalating retaliatory/harassmental civil rights violations" caused him to file several "needless" lawsuits (#112, p. 6). Plaintiff describes this pattern of retaliation in his recitation of facts pertinent to count one of this action, but does not state specifically that defendant Chambliss's actions were retaliatory. *Id.* Plaintiff attaches defendant Chambliss's responses to interrogatories to his opposition, wherein defendant Chambliss states that he "does not have personal knowledge or recollection of any specific grievance or lawsuit that Plaintiff may have filed against him," prior to the confiscation of the mattress. *Id.* at 59.

Plaintiff also notes that dismissed defendants denied him due process and that defendant Chambliss is not entitled to immunity for his acts (#112, p. 7, 9). Plaintiff requests the court to strike Exhibit J to defendants' motion from the record stating that defendants used the exhibit, the notice of charges and summary of the disciplinary hearing associated with confiscation and charges for the

defaced mattress, "in an attempt to cast an 'unfavorable!' impression of plaintiff with this court's proceedings." *Id.* at 8.

Defendants argue that plaintiff admittedly altered his state-issued mattress, rather than using the available procedure to request issuance of another mattress (#102, p. 6; #102-2, p. 3). Pursuant to Administrative Regulation ("AR") 704, "each inmate shall be provided with a suitable issue of clothing and bedding supplies" (#102-5, p. 3). The regulation also provides that "any inmate, who alters . . . state-issued clothing and bedding . . . is subject to disciplinary action." *Id.* "Restitution shall be assessed if found guilty of such an action." *Id.* ESP Institutional Procedure ("IP") 7.01 conforms to this regulation and provides that "[m]atresses which have been ripped, torn, cut or otherwise damaged will be replaced and the inmate who damaged the mattress will be charged with a violation of the Code of Penal Discipline and will be assessed restitution." *Id.* at 8. Defendants attach disciplinary hearing forms for plaintiff, which show that he declined to make a statement at the hearing during which NDOC officials forfeited his mattress and assessed him forty-nine dollars in restitution (#102-3, p. 3-4). Plaintiff later sent a letter to NDOC officials explaining that he believed that the damage to the mattress was the result of normal wear and tear. *Id.* at 9-10. Plaintiff requested that the restitution be dismissed. *Id.*

Defendants believe that plaintiff's alteration of the mattress prevented NDOC from "determining whether Plaintiff's mattress was damaged as a result of normal wear and tear," and thus replaceable (#102, p. 7). Defendants note that they charged plaintiff a reasonable amount of restitution, forty-nine dollars, and collected the payment from plaintiff's inmate account pursuant to Nevada Revised Statute 209.246(1)(a). *Id.* Defendants confirm the cost of a mattress at the time, fifty dollars, by attaching a receipt showing the purchase of mattresses in June 2004 (#102-2, p. 19).

Defendants claim that the regulation, institutional procedure, and state law are all "related to the legitimate penological interest of ensuring that inmates are accountable for their actions and are obligated to compensate the State for damaged or destroyed property" (#102, p. 7). Finally, defendants note that plaintiff cites the First Amendment in count one, but does not include facts to support such a claim, as defendants searched plaintiff's cell as "part of a search of Plaintiff's entire tier . . . Plaintiff was not individually singled out." *Id.*

3

### B. Count Two

Plaintiff claims that he received two unbound law books from the court, which he "bound together with shoe string thats [sic] required to bind books, metal binding implements not allowed in prison" (#1-6, p. 4). Plaintiff describes the books as "9th Circuit/U.S. Supreme Court Rules of Procedure." *Id.* at 9. In his opposition to defendants' motion, plaintiff explains that he was instructed by an NDOC officer, who is not a party to the instant dispute, to bind one of the books with a shoelace to prevent the book from being confiscated in future cell searches (#112, p. 10, 84). Despite this direction and the belief that the books "were cleared for possession by numerous other officials," plaintiff alleges that defendant Messick confiscated the books in retaliation for previous lawsuits filed against him by plaintiff (#1-6, p. 4). Plaintiff believes that the confiscation of these two books "caus[ed] plaintiff's access to court(s) and pending civil action suits to be hindered/delayed" (#112, p. 10).[2] Further, plaintiff argues that he has a liberty interest in his personal property. *Id.* at 11. Plaintiff also notes that previously dismissed defendants denied his grievances resulting in deprivation of his due process rights. *Id.*

Defendants claim that plaintiff admits to altering the books by binding them with a shoelace and that, as a result of this alteration, the books are considered "contraband" (#102, p. 8; #102-6, p. 3). Defendant Messick confiscated the contraband pursuant to AR 711. *Id.* Further, defendants note that NDOC conducted the search of plaintiff's cell as "part of a search of all of the cells on Plaintiff's tier," not in retaliation for plaintiff's grievances and lawsuits. *Id.* In response to plaintiff's belief that confiscation of the books hindered his access to the courts, defendants comment that plaintiff was not injured because he "still had access to the procedural rules for the Ninth Circuit and the United State [sic] Supreme Court through the ESP prison law library." *Id.* at 10. Despite availability of these documents, plaintiff never requested copies. *Id.*; *see also* Exh. C, Declaration of Debra

---

[2] In his opposition, plaintiff argues that NDOC officials refused to mail the books they seized from his cell to an outside address pursuant to IP 7.06 (#112, p. 12). Plaintiff raised this issue in his complaint alleging that defendants McDaniel, Endel, and Whorton "conspired with deliberate acts/omissions to undermine plaintiff's 'unauthorized property (U/A)' brass slip (I.O.U.) Mail out postage rule . . . by instituting a 'new law!'" (#1-6, p. 5). However, the court dismissed all claims against defendants McDaniel, Endel, and Whorton (#36); therefore, any allegations regarding the prison's brass slip procedure are moot.

1  Lightsey, #102-2, p. 9 ("A search of Steven Cox #40295 submissions from 2004 to 2008 to the Ely
2  law library was conducted and no kite or request for procedural rules has been located.").

### C.   Count Seven

Plaintiff states that he was prescribed Elavil to control his "'severe' depressions [sic], anxieties [sic], suicidal tendencies, etc." (#1-6, p. 17). He believes defendant Bishop terminated his prescription in retaliation for "plaintiff's request to use 'portable!' bedside lamp to turn-on for 6:30pm (ESP)'s [sic] 'stand-up, lights on!" inmate head count." *Id.* Plaintiff states that defendant Bishop's responses to his medical kites about the issue reveal that he "was already preparing 'invalid' excuses to deny plaintiff his psych/PTSD medicine use" (#112, p. 14). The kites are difficult to read, but it appears that the responses include the following statements: (1) "You are already getting Elavil which was increased 12/12/04 and we are awaiting response to the medicine, will set up appt;" (2) "Will review your chart history, chart review no change need for Elavil;" and (3) Can not [sic] read kite, please re-kite and print, kite medical re pain meds" (#112-1, p. 14, 16, 18).

Defendants counter plaintiff's assertions by offering plaintiff's medical records and defendant Bishop's declaration to show that plaintiff requested that his prescription be terminated because he complained "that the Elavil was making it difficult for him to stand" (#102-2, p. 11). Specifically, defendant Bishop explains that "the decision to discontinue Elavil was based on Plaintiff's statements regarding the effects of the medicine on his ability to stand." *Id.* at 12. Defendant Bishop also noted in plaintiff's medical record on August 29, 2005, that he discontinued the Elavil because plaintiff stated that he "can't stand due to Elavil" (#103-1, p.8 (*sealed*)). Defendants also note that defendant Bishop, as medical staff, would not be involved with plaintiff's requests for items such as a bedside lamp; therefore, "[p]laintiff can establish no link between his request to be exempt from count and the termination of his Elavil prescription." *Id.* at 14. Defendant Bishop states that he "was unaware that Plaintiff requested a bedside lamp from Warden McDaniel and I was not involved in handling Plaintiff's request for this lamp" (#102-2, p. 12).

### D.   Count Eight

Plaintiff claims that defendant Lemich denied his medical care on July 26, 2006, in retaliation

1  for the grievances he filed against her (#1-6, p. 20).  Defendants state that it is impossible that
2  defendant Lemich refused to see plaintiff on that date as she was no longer employed at ESP (#102,
3  p. 14).  In her declaration, defendant Lemich states: "I was no longer employed with the NDOC on
4  July 26, 2006 and was not at Ely State Prison medical facility at any time during July 2006" (#102-2,
5  p. 16).  Defendant Lemich confirmed this response in her response to plaintiff's interrogatory
6  number fifteen (#112-1, p. 44).  Defendants believe plaintiff "admitted knowledge of this
7  information in a request to the medical department" (#102, p. 14).  The cited record is difficult to
8  read, but it appears that plaintiff asked whether defendant Lemich still served as the lead physician
9  and, if not, on what date NDOC terminated her (#103-2, p. 3 (*sealed*)).  In his opposition, plaintiff
10 cites to several medical kites he believes evidence defendant Lemich's employment at ESP up to one
11 day prior to defendant Lemich's alleged denial of plaintiff's request for medical services (#112, p.
12 21).

13        Defendants filed the instant motion seeking summary judgment on all remaining claims
14 (#102).  Plaintiff opposed (#112) and defendants replied (#114).  Defendants previously filed a
15 motion for summary judgment (#73); however, they withdrew the motion to investigate plaintiff's
16 claims that he did not have adequate access to the law library and, therefore, could not prepare his
17 opposition to the motion (#96).  Defendants discussed with plaintiff his claims that he was denied
18 access to the law library and provided a report to the court (#97).  Based upon this report, the court
19 noted that it is "clear that the majority of information plaintiff claims he did not receive had nothing
20 whatsoever to do with this action" (#98, p. 2).  Defendants filed the instant motion (#102) three
21 weeks later.

22        The court notes that the plaintiff is proceeding *pro se*.  "In civil rights cases where the
23 plaintiff appears *pro se*, the court must construe the pleadings liberally and must afford plaintiff the
24 benefit of any doubt."  *Karim-Panahi v. Los Angeles Police Dep't*, 839 F.2d 621, 623 (9th Cir.
25 1988); *see also Haines v. Kerner*, 404 U.S. 519, 520-21 (1972).
26 ///
27 ///
28 ///

## II. DISCUSSION & ANALYSIS

**A.  Discussion**

    **1.  Summary Judgment Standard**

Summary judgment allows courts to avoid unnecessary trials where no material factual disputes exist. *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994). The court grants summary judgment if no genuine issues of material fact remain in dispute and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The court must view all evidence and any inferences arising from the evidence in the light most favorable to the nonmoving party. *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996). However, the Supreme Court has noted:

> [W]e must distinguish between evidence of disputed facts and disputed matters of professional judgment. In respect to the latter, our inferences must accord deference to the views of prison authorities. Unless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgment stage.

*Beard v. Banks*, 548 U.S. 521, 530 (2006). Where reasonable minds could differ on the material facts at issue, however, summary judgment should not be granted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986).

The moving party bears the burden of informing the court of the basis for its motion, and submitting evidence which demonstrates the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the party opposing the motion may not rest upon mere allegations or denials in the pleadings, but must set forth specific facts showing that there exists a genuine issue for trial. *Anderson*, 477 U.S. at 248. Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322-23.

**B.  Analysis**

As an initial matter, plaintiff includes several tangential arguments in his opposition to defendants' motion. First, plaintiff claims that he prepared his opposition under "severe duress,

7

obstruction of justice, etc. tactic by defendants" (#112, p. 1 n.1). Specifically, plaintiff states that defendants confiscated and destroyed his legal materials, denied or delayed his access to the law library, and restricted him to suicide/homicide watch due to his belief that he has the "ability to prove God's existance [sic] via a 4,000 year old code/mathematical sequence of the golden ration encoded in the Holy Bible." *Id.* at 2 n.1. As the court noted above, defendants withdrew and refiled the instant motion to allow time to investigate plaintiff's claims that he was unable to prepare his opposition due to limited access to the law library (#96). The investigation revealed that plaintiff's claims that he could not access the law library were unfounded for the instant dispute (#97, 98); therefore, the court proceeds with its analysis.

Second, plaintiff requests that "this motion be based on Fed. R. Civ. P. 12(c)" and presents the legal standard for motions to dismiss. *Id.* at 2. Plaintiff does not explain why he believes the court should construe defendants' summary judgment motion as a motion to dismiss. *Id.* Defendants previously filed a motion to dismiss (#11), to which plaintiff responded (#16) and the court ruled (#25, 36). Further, a summary judgment motion is appropriate at this point in the litigation. *See* Fed. R. Civ. P 56(a)-(b). Accordingly, the court declines to apply the motion to dismiss standard requested by plaintiff.

Third, plaintiff states that he "'formally' objects to the dismissal of counts: III, IV, and VI and all defendants therein" (#112, p. 2). The court notes that plaintiff properly raised his objections to this court's Report and Recommendation on May 13, 2009 (#26), and the District Court adopted the Report and Recommendation over plaintiff's objections (#35). Plaintiff's opportunity to raise objections to the Report and Recommendations passed and such objections may not be raised in the current motion practice. *See* 28 U.S.C. § 636(b)(1)(c); LR 3-2.

**1.    Due Process**

The Due Process Clause of the Fourteenth Amendment protects individuals from arbitrary government action by prohibiting states from depriving people of "life, liberty, or property without due process of law." U.S. Const. amend. XIV. In order to prevail on a claim of deprivation of property without due process of law, a plaintiff must first establish the existence of a constitutionally protected interest in the property. After meeting this threshold requirement, the plaintiff must then

1  demonstrate that defendants failed to provide the process due. *Wolff v. McDonnell*, 418 U.S. 539
2  (1974).
3      Prisoners retain certain property interests despite being incarcerated. For example, courts
4  have held that inmates have constitutionally protected property interests in hobby kits ordered while
5  in prison, *Parrat v. Taylor*, 451 U.S. 527, 536 (1981); funds in their inmate accounts, *Quick v.
6  Jones*, 754 F.2d 1521, 1523 (9th Cir. 1984); and books, *Caldwell v. Miller*, 790 F.2d 589, 608
7  (7thCir. 1986). Once a protected property interest is found, the court need only decide what process
8  is due under the Fourteenth Amendment. *Quick,* 754 F.2d at 1523. This is a question of law. *Id.*
9      However, even when prisoners have a protected property interest in a particular item, it does
10 not necessarily mean that the inmate may possess the item while incarcerated. Section 209.239 of
11 the Nevada Revised Statutes provides for the regulation of personal property of offenders. Nev. Rev.
12 Stat. § 209.239. Pursuant to this law, NDOC enacted AR 711, which provides that prisons will not
13 permit the possession of contraband by inmates (#102-6, p. 6).[3] Under the regulation, contraband
14 includes "any authorized property that has been altered." *Id.* at 3. Inmates are to be "advised of the
15 personal property items, which may be retained in his possession." *Id.* at 5. One of the stated
16 purposes of the regulation is "[t]o prevent the introduction of contraband or articles which would
17 constitute a threat to the safety of staff and inmates or to the security of the institution/facility." *Id.*
18 at 3.
19     Authorized deprivations of property are permissible if carried out pursuant to a regulation
20 that is reasonably related to a legitimate penological interest. *Turner v. Safley*, 482 U.S. 78, 89
21 (1987). Three factors are relevant in determining the reasonableness of a regulation: (1) whether the
22 connection between the regulation and the legitimate government interest purportedly served by the
23 regulation is valid and rational, (2) whether there is an alternate means for the inmate to exercise his
24 right, and (3) the impact on guards and other inmates of accommodation of the right. *Id.*
25      **a.    Count One**
26      As it is settled law that inmates have a property interest in their inmate accounts, and NDOC

---

[3] Defendants attach the relevant version of AR 711 to their motion (#102-6).

9

1  charged plaintiff's account pursuant to regulation, the relevant inquiry is whether plaintiff received
2  the process due, prior to defendants' withdrawal of restitution from his inmate account, and whether
3  the regulation defendants used is valid. Plaintiff does not seem to suggest that defendants failed to
4  afford him due process protections, such as a hearing or the opportunity to present evidence. In fact,
5  defendants present uncontested evidence documenting plaintiff's disciplinary hearing and the
6  restitution charges to his account. Plaintiff offers no evidence to suggest procedural flaws with that
7  hearing. Rather, plaintiff simply argues that he should not be required to pay the full replacement
8  value of the mattress. In support of this assertion, plaintiff offers no evidence that the mattress
9  should be valued at less than fifty dollars, other than his own assessment of the mattress's condition.
10 On the other hand, defendants point out that they were deprived of the opportunity to evaluate the
11 mattress by plaintiff's deliberate alteration - an alteration he admits to making. Further, they attach
12 a receipt demonstrating that the cost of replacement for mattresses at the time was fifty dollars.
13 Therefore, according to the facts supplied by plaintiff and defendant, plaintiff received a pre-
14 deprivation hearing, NDOC responded to his grievances regarding the restitution value, and he was
15 charged the replacement value of the mattress he defaced. Plaintiff fails to demonstrate that he did
16 not receive the process due; therefore, defendants' motion for summary judgment on this claim
17 should be granted.

18        Additionally, though plaintiff does not argue that the regulations NDOC used to charge him
19 restitution are invalid, the court notes that charging restitution for intentional damage to prison
20 property by an inmate is both reasonable and necessary. To the extent that plaintiff's claims call into
21 question the validity of the regulation and procedure, defendants state that the legitimate goal of the
22 regulation is "ensuring that inmates are accountable for their actions and are obligated to compensate
23 the State for damaged or destroyed property." The state prison system has limited funding; therefore,
24 it is important that regulations, such as this one, allow the prison to collect restitution from inmates
25 who deliberately damage property, as the prison budget should not be stretched further to cover such
26 expenses. Therefore, the court finds that the regulation allowing inmates to be charged with
27 restitution for intentional damage to prison property is valid, as it advances a legitimate correctional
28 purpose.

### b. Count Two

Plaintiff's second due process claim relates to defendant Messick's confiscation of two altered legal books from plaintiff's cell. Again, defendant Messick confiscated the books pursuant to prison regulation, noting that altered property is considered contraband, which may not be possessed by inmates. Plaintiff's due process claim fails because he does not have a protected interest in contraband items. While plaintiff may have a protected interest in his books, it does not follow that if he alters the books, transforming them into contraband items, he retains that protected interest. As such, defendant Messick's deprivation of the books does not form the basis of a due process claim.

However, assuming without deciding that plaintiff has a protected property interest in the two legal books, defendants owed plaintiff predeprivation protection. Plaintiff does not allege any procedural defects with the due process afforded to him, other than the fact that defendants previously dismissed from this suit did not respond to his grievances. Further, AR 711 provides that plaintiff was made aware upon entry into ESP of the property policy, including NDOC's policy prohibiting the alteration of items and the possession of altered items or contraband. Therefore, plaintiff was presumably aware of the fact that altering items violated prison procedure, despite the fact that other NDOC officers allegedly allowed him to keep the altered books. Plaintiff's primary complaint does not seem to be that he was not aware that alteration of property resulted in seizure, but rather a generalized grievance about having his property taken. However, this is insufficient to state a due process claim. Further, as defendants noted, plaintiff could have accessed the very same books through the prison library; therefore, he did not suffer an injury from the deprivation.

Given the facts described above, the court recommends that defendants' motion for summary judgment on this claim be granted.

### 2. Retaliation

"A prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822 (1974). "Of fundamental import to prisoners are their First Amendment 'rights to file prison grievances . . .'" *Rhodes v. Robinson*, 408 F.3d 559, 567 (9th Cir.

11

2005) (quoting *Bruce v. Ylst*, 351 F.3d 1283, 1288 (9th Cir. 2003)). "Because purely retaliatory actions taken against a prisoner for having exercised those rights necessarily undermine those protections, such actions violate the Constitution quite apart from any underlying misconduct they are designed to shield." *Id.* "Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmates exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes*, 408 F.3d at 567-68.

### a. Count One

Plaintiff cites to a "yearly pattern/chronology of false/dubious" actions taken against him by NDOC officials. However, plaintiff fails to allege that, in this particular case, defendant Chambliss found him guilty of defacing his mattress and charged him restitution in retaliation for filing previous grievances. As a result, plaintiff does not establish that defendant Chambliss's actions were "because of" plaintiff's grievance filings. Therefore, the court recommends that defendants' motion for summary judgment on this claim be granted.

### b. Count Two

Plaintiff contends that defendant Messick confiscated his law books, which were bound together with a shoelace, because plaintiff previously filed lawsuits against him. As evidence of defendant Messick's retaliatory intent, plaintiff states that other NDOC officers knew about the altered books and allowed him to keep them. Defendants state that the search of plaintiff's cell, which resulted in the confiscation of the law books as contraband, was conducted as part of search of all of the cells on plaintiff's tier. Further, defendant Messick notes that he confiscated the law books because they had been altered and, as such, were considered contraband under AR 711.

Because defendant Messick discovered the books in a general search and confiscated them as contraband, plaintiff's claim that his actions were "because of" plaintiff's previously filed lawsuits is not persuasive. In other words, defendant Messick's actions were pursuant to his job duties and prison regulation, not the result of retaliation against plaintiff. Plaintiff's claims that other officers did not abide by the restrictions imposed on inmates in AR 711 is not conclusive evidence that

1  defendant Messick's compliance with the rule demonstrates his retaliatory motive. Further, there
2  is no evidence that defendant Messick singled plaintiff out for a supposed retaliatory search.
3  Therefore, the court recommends that defendants' motion for summary judgment on this claim be
4  granted.

        **c.**        **Count Seven**

6  Plaintiff claims that defendant Bishop terminated his Elavil prescription in retaliation for
7  plaintiff's request for a bedside lamp. Defendant Bishop states that he terminated plaintiff's
8  prescription due to plaintiff's complaints about the medication, and that he was unaware of plaintiff's
9  requests for a lamp. Defendants' sworn statement and notes made in plaintiff's medical record on
10 August 29, 2005, both state that he discontinued Elavil because plaintiff complained that he could
11 not stand due to the medication. As defendant Bishop discontinued the medication due to plaintiff's
12 complaints, plaintiff cannot show that defendant Bishop's actions were "because of" plaintiff's
13 request for a bedside lamp. Therefore, the court recommends that defendants' motion for summary
14 judgment on this claim be granted.

        **d.**        **Count Eight**

16 Plaintiff claims that defendant Lemich retaliated against him for filing grievances against her
17 by refusing to provide plaintiff with medical care on July 26, 2006. Defendant Lemich's sworn
18 statement, her answers to plaintiff's interrogatories, and defendants' motion all state that defendant
19 Lemich did not work at NDOC on July 26, 2006, and further that defendant Lemich was not at ESP
20 on that day. Plaintiff did not offer any evidence related to defendant Lemich's employment at
21 NDOC to counter defendants' contentions. Rather, plaintiff provided statements from several
22 medical kites which he believes prove that defendant Lemich worked at ESP on the date he was
23 denied medical care. The court reviewed these statements and does not agree that they prove
24 defendant Lemich's employment at ESP on July 26, 2006. Therefore, as defendant Lemich could
25 not have denied plaintiff medical care on July 26, 2006, because she did not work at NDOC at the
26 time, she could not have retaliated against plaintiff. The court recommends that defendants' motion
27 for summary judgment on this claim be granted.
28 ///

### 3. Deliberate Indifference to Serious Medical Needs

A prisoner's claim of inadequate medical care arises under the Eighth Amendment. The unnecessary and wanton infliction of pain constitutes cruel and unusual punishment forbidden by the Eighth Amendment. *Whitley v. Albers*, 475 U.S. 312, 319 (1986). To prevail on an action alleging cruel and unusual punishment, a plaintiff's case must satisfy an objective standard – that the deprivation was serious enough to amount to cruel and unusual punishment, and a subjective standard – deliberate indifference. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *see also Wilson v. Seiter*, 501 U.S. 294, 297-304 (1991). A prison official violates the Eighth Amendment when he responds with deliberate indifference to an inmate's serious medical need. *Farmer*, 511 U.S. at 834.

The objective requirement of a "serious medical need" is met if the failure to treat a prisoner's condition could result in further significant injury or the "unnecessary and wanton infliction of pain." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). In this circuit, examples of serious medical needs include "the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000) (citations omitted).

The subjective standard of deliberate indifference requires "more than ordinary lack of due care for the prisoner's interests or safety." *Farmer*, 511 U.S. at 835, (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986)). The requisite state of mind lies "somewhere between the poles of negligence at one end and purpose or knowledge at the other." *Id.* at 836. To prove deliberate indifference, plaintiff must demonstrate that prison staff denied, delayed, or intentionally interfered with medical treatment or that the way prison staff provided medical care indicates deliberate indifference, and that plaintiff sustained damages as a result of such conduct. *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988). Prison medical staff do not violate the Eighth Amendment simply because their opinion concerning medical treatment conflicts with the opinion of the inmate-patient. *Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981). Moreover, "mere delay of surgery, without more, is insufficient to state a claim of deliberate medical indifference." *Shapley v. Nev. Bd.*

*of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985) (per curiam); *accord McGuckin v. Smith*, 974 F.2d 1050, 1060 (9th Cir. 1992).

Further, a difference of opinion between medical professionals concerning the appropriate course of treatment generally does not amount to deliberate indifference to serious medical needs. *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). However, a prisoner can establish that such a difference of opinion amounted to deliberate indifference where "the course of treatment the doctors chose was medically unacceptable under the circumstances," and such a course of treatment was chosen "in conscious disregard of an excessive risk to the prisoner's health." *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996) (citing *Williams v. Vincent*, 508 F.2d 541, 543-44 (2d Cir. 1974) (holding that inmate stated a claim for deliberate indifference where prison medical staff threw away the inmate's severed ear, told the inmate that 'he did not need [it],' and made no effort to reattach it)).

### a. Count Seven

Plaintiff claims that defendant Bishop acted with deliberate indifference to his medical needs when he discontinued plaintiff's prescription for Elavil, a medication plaintiff says that he took for depression and anxiety. Defendant Bishop's sworn statement and plaintiff's medical records state that plaintiff complained of his inability to stand due to the Elavil, causing defendant Bishop to discontinue the medication. Plaintiff's medical records, including his kites, show that he communicated with healthcare staff at ESP on numerous occasions about his use of Elavil.

The court notes that the use of Elavil by plaintiff for depression, anxiety, and associated pain may addressed a serious medical need, thereby satisfying the objective prong of an inadequate medical care claim. Left untreated, depression and anxiety can certainly result in physical and emotional pain and would most likely affect daily functioning. However, plaintiff's claim that defendant Bishop was deliberately indifferent to his medical needs fails. It is true that defendant Bishop terminated plaintiff's treatment; however, he based his decision upon plaintiff's complaints that the medication made it difficult for him to stand. This decision, along with plaintiff's record of visits to healthcare staff regarding his use of Elavil, demonstrate that defendant Bishop and other medical staff at ESP were attentive to plaintiff's medical needs and requests. Surely plaintiff would

1 be equally upset if defendant Bishop ignored his complaints about the Elavil and continued treatment
2 despite the ill effects of the medication. Plaintiff cannot request changes in his medical care and then
3 subsequently claim violation of his Eighth Amendment rights when defendant Bishop complies with
4 plaintiff's wishes. As plaintiff presents no other evidence of defendant Bishop's alleged deliberate
5 indifference to his medical needs, the court recommends that defendants' motion for summary
6 judgment on this claim be granted.

        **b.**    **Count Eight**

As noted above, plaintiff claims that defendant Lemich violated his constitutional rights at a time that she claims, in her sworn statement and her responses to plaintiff's interrogatories, she did not work at ESP. Plaintiff alleges that defendant Lemich refused to provide him with medical care on July 26, 2006, in violation of his Eighth Amendment rights. Plaintiff cites to several medical kites he believes demonstrate that defendant Lemich worked at ESP up to the day before the alleged denial of care. The court reviewed the statements to which plaintiff refers and is unable to discern how plaintiff believes they prove that defendant Lemich worked at ESP on July 26, 2006, or the day before. As defendant Lemich did not work at ESP on July 26, 2006, nor was she at ESP on that date, it is not possible that she denied medical care to plaintiff. Therefore, the court recommends that defendants' motion for summary judgment on this claim be granted.

### III. CONCLUSION

Based on the foregoing and for good cause appearing, the court concludes that defendants met their burden of proving that there are no genuine issues of material fact for trial. Therefore, the court recommends that defendants' motion for summary judgment (#102) be **GRANTED**. The parties are advised:

1. Pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule IB 3-2 of the Local Rules of Practice, the parties may file specific written objections to this Report and Recommendation within fourteen days of receipt. These objections should be entitled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the District Court.

2. This Report and Recommendation is not an appealable order and any notice of appeal

pursuant to Fed. R. App. P. 4(a)(1) should not be filed until entry of the District Court's judgment.

## IV.  RECOMMENDATION

**IT IS THEREFORE RECOMMENDED** that defendants' summary judgment motion (#102) be **GRANTED**.

**DATED:** February 14, 2011.

_____
**UNITED STATES MAGISTRATE JUDGE**